IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HASSANALI DASHTPEYMA,

    Plaintiff,

v.

LIBERTY INSURANCE CORPORATION,

    Defendant.

CIVIL ACTION NO.
1:11-cv-3809-JEC

### ORDER & OPINION

This matter is presently before the Court on the defendant's Motion for Summary Judgment ("DMSJ") [78]. The plaintiff originally filed suit in the Superior Court of Gwinnett County, seeking a declaratory judgment that the insurance policy issued by the defendant, Liberty, covered damage to his home caused by a storm. The action was removed pursuant 28 U.S.C. § 1332.

The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that the defendant's Motion for Summary Judgment [78] should be **GRANTED**.

### BACKGROUND

This dispute arises from plaintiff's insurance claim for damages that resulted from a severe storm that hit the Atlanta area in April 2011. After the denial of a majority of his insurance claims,

plaintiff, proceeding *pro se*, brought suit against his insurer, Liberty Insurance Corporation ("Liberty").[1] (Not. of Rem. [1] at ¶ 1.) Plaintiff not only sought a declaration that his insurance claim was covered, but also made a claim for bad faith damages pursuant to O.C.G.A. §§ 33-4-6, 13-6-11 and 13-11-8 for Liberty's alleged stubborn litigiousness and bad faith in denying plaintiff's insurance claim. (*Id.* at Ex. A.)

I. **PROCEDURAL HISTORY AND DISCOVERY DISPUTES**

This litigation has proven contentious from the start. First, Hassanali[2] Dashtpeyma is not the typical *pro se* plaintiff. Although he has never been a member or even applied for membership to the State Bar of Georgia, Mr. Dashtpeyma obtained a law degree from the Atlanta Law Center in 1993 and received an L.L.M. in Litigation from the same institution a year later. (Hassanali Dashtpeyma ("Dash.") Dep. [82] at 9 & 12.) During discovery, plaintiff has behaved aggressively, filing three separate motions to compel as well as a motion to quash the defendant's subpoena to take the deposition of

---

[1] Initially, plaintiff erroneously named "Liberty Mutual Group" as the defendant. However, plaintiff amended its complaint to reflect the proper defendant. (*See* First Am. Compl. [7].)

[2] There are instances found within the record and in motions where Mr. Dashtpeyma's given name is stated as two separate names, "Hassan Ali," and other times where it is just the single name, "Hassanali." As plaintiff uses just a single name in his response, the Court will as well. (*See* Pl.'s Br. In Opp. To DMSJ ("Pl.'s Resp.") [86] at 1.)

his wife, Klara. (*See* Baverman July 2012 Order [66] at 2.) His third motion to compel was filed before the deadline for defendant to respond had even expired. (*Id.*) Further, plaintiff's motion to quash the defendant's subpoena of his wife was largely based on a typographical error in defendant's subpoena in which the last number of the claim identification number was mistakenly left off. (*See* Pl.'s Mot. To Quash [54] and Def.'s Resp. To Pl.'s Mot. To Quash [56] at 3-4.)

In ruling on plaintiff's motions to compel and for sanctions against the defendant, Judge Baverman found that it was the plaintiff, not defendant, who had behaved unreasonably. Accordingly, Judge Baverman denied the motions as being frivolous. (*See id.* at 6.) In addition to formally warning the plaintiff about future sanctions, Judge Baverman directed plaintiff to show cause for why he should not be required to pay the defendant's filing fees after requiring them to respond to frivolous motions. (*Id.* at 17.) In his subsequent order sanctioning the plaintiff, Judge Baverman noted that his decision was supported by the evidence on record, which illustrated that the plaintiff, rather than the defendant, had been the harassing, uncooperative party throughout discovery, not just by filing frivolous motions, but also through actions at his own deposition. (Baverman August 2012 Order [71] at 10-13.)

Shortly thereafter, defendant filed the present motion for

3

summary judgment. Defendant maintains essentially the same position it took when initially denying the claim: that the coverage policy excludes the damages sought by the plaintiff and thus, defendant is not liable to plaintiff for the damage, nor was it unreasonable in denying his insurance claim. (DMSJ [78] at 2.)

## II.  **INSURANCE POLICY**

Homeowners Policy, Number H 37-258-552703-400 7 (the "policy"), covers the residence at 446 Summit Club Drive, Marietta, Georgia 30068 and was issued to Hassanali Dashtpeyma for the period of August 8, 2010 to August 8, 2011. (Policy,[3] attached as Ex. E to Def.'s Initial Disclosures [5].) There are several provisions of the policy pertinent to the instant action. "Coverage A" defines what constitutes a dwelling or residence for purposes of the policy and is subsequently referenced throughout the policy. (*Id.* at 12-13.) "Coverage B" provides the general definition for other structures that may also be covered even if they are not directly attached to the dwelling. (*Id.* at 13.)

The appropriate bounds of the above provisions are not

---

[3] Although not formally, plaintiff appears to make the argument that the policy being referenced by defendant differs from the policy actually issued to him. In an abundance of caution, the Court compared the copy defendant initially disclosed with the copy of the policy plaintiff originally attached to his state court complaint. As the two documents contain no material differences, the Court rejects this argument, if it is indeed being made.

4

contested, but other provisions in the policy are.  Under "Section I - Perils Insured Against," the policy provides:

> **COVERAGE A - DWELLING and COVERAGE B - OTHER STRUCTURES**
>
> We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property.  We do not insure, however, for loss:
>
>      . . .
>
> 2.   Caused by:
>
>      . . .
>
>      e. Any of the following:
>
>           (1)  Wear and tear, marring, deterioration;
>
>           (2)  Inherent vice, latent defect, mechanical breakdown[.]

(*Id.* at 17 (emphasis added).)

This section of the policy further provides:

> **COVERAGE C - PERSONAL PROPERTY**
>
> We insure for direct physical loss to the property described in Coverage C caused by a peril listed below unless the loss is excluded in SECTION 1 - EXCLUSIONS.
>
> . . .
>
> 2. **Windstorm or hail**.
>
>      This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

(*Id.* at 17-18)(emphasis added).

5

In the next section of the policy, entitled "SECTION I - EXCLUSIONS," the policy states:

> 1. We do <u>not</u> insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
>
> . . .
>
> e. **Neglect**, meaning neglect of the "insured" to use all reasonable means to save and preserve property at and after the time of a loss.
>
> . . .
>
> 2. We do <u>not</u> insure for loss to property described in Coverages A and B caused by any of the following[]
>
> . . .
>
> c. **Faulty, inadequate or defective:**
>
> • • •
>
> (4) Maintenance;
>
> of part or all of any property whether on or off the "residence premises."

(Policy [5] at 18-19)(emphasis added).

### III. RELEVANT FACTS

While this litigation has been acrimonious, there can be little dispute as to the facts. Therefore, unless otherwise noted, the following facts are not in dispute.

On April 16, a severe storm in Atlanta caused damage to the plaintiff's home. (Compl., attached as Ex. A to Not. of Removal [1],

6

at ¶ 3.) Plaintiff subsequently submitted a claim[4] to his insurer and defendant in this action, Liberty. (*Id.* at ¶ 6.) Liberty assigned the case to James Monaghan, an adjuster contracted through a third-party, the Worley Companies, and Monaghan visited the insured property on April 30. (Def.'s Statement of Material Facts ("DSMF") [78] at ¶ 8.) During his inspection, Monaghan took photos of the house and completed a report based on this visit. (Monaghan Dep. [74] at 28.) He found that the storm had not created a hole in which rain had entered the home (*id.* at 58-60), but instead that rain had seeped into the house because of rot that had eaten away the siding and window sills. (Monaghan Aff., attached as Ex. E to DMSJ [78], at ¶ 6.) The pictures taken by Monaghan depict the rotting siding and window sills where the water was leaking into the house. (Monaghan Dep. [74] at Ex. 11.) For these reasons, Monaghan determined that the cause of the plaintiff's interior water intrusion "was faulty, inadequate or defective maintenance, as well as wear and tear, neglect and deterioration of siding and window sills," (Monaghan Aff. [78-1] at ¶ 6), and found that the only damage covered under the policy were those that resulted from wind-driven rain. (Monaghan Dep. [74] at 29.) He assessed the reasonable cost of repairing the covered damages to be $2,679.50. (DSMF [78] at ¶ 13.)

---

[4] The claim number is 18644614-01. (Compl. [1] at ¶ 6.)

Mr. Monaghan's report was then independently reviewed by another claims adjuster, Eric Aucoin, who Liberty also contracted through Worley. (*Id.* at ¶ 14-15.) In addition to reviewing the pictures in Monaghan's report, Aucoin also reviewed additional pictures submitted to him by the plaintiff. (*Id.* at ¶ 15.) Aucoin determined that Monaghan properly assessed the damages to plaintiff's home and the cause of the loss. (Aucoin Dep. [73] at 20, DSMF [78] at ¶ 17.)

Because plaintiff was upset with this low estimate and declination of coverage of his personal property (Monaghan Dep. [74] at Ex. 4), defendant Liberty sent their own Senior Property Loss Specialist to inspect plaintiff's home in order to reevaluate the insurance claim. (Gill Dep. [57] at 90.) Gill agreed with Monaghan that the "cause of [the] interior leakage was from rot on the exterior siding." (*Id.* at 32-33.) Further, Gill found that the rot was not caused by the storm itself but "was a result of ongoing lack of maintenance, wear-and-tear, and deterioration." (*Id.* at 36.) Gill did increase the estimate for the cost of repairing the covered damage, to $3,721.85. (*Id.* at 68.) Based on Gill's estimate, Liberty issued a check to the plaintiff for $37.91, which represented the estimated cost of repair, less depreciation and plaintiff's deductible. (*Id.* at Ex. 2 and DSMF [78] at ¶ 22.)

Unsatisfied with Liberty's decision, plaintiff filed the present suit in the Superior Court of Gwinnett County on October 10, 2011,

8

alleging that more of the damage was covered under the policy and that Liberty violated several Georgia laws by denying coverage in bad faith. (Compl., attached as Ex. A to Not. of Removal [1].) Defendant timely removed the action. (Not. of Removal [1].) After the close of discovery, defendant then filed the present summary judgment motion. (DMSJ [78].)

## DISCUSSION

### I. LEGAL STANDARDS

#### A. Summary Judgment Standard

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file and any affidavits, show "that there is no genuine [issue] as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). It is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts

immaterial. *Id.* at 322-23 (quoting F<small>ED</small>. R. C<small>IV</small>. P. 56(c)).

The movant bears the initial burden of asserting the basis for his motion. *Id.* at 323. When evaluating whether this burden has been met, "the district court must review the evidence and all factual inferences drawn therefrom, in the light most favorable to the non-moving party." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918-19 (11th Cir. 1993). Once this initial burden is met, then the non-movant must go beyond the pleadings to establish that there exists a genuine issue of material fact. *Id.* The mere existence of a scintilla of evidence is insufficient, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and the non-movant must present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.

### B. Insurance Contracts

In Georgia, an insurance policy is treated as a contract, and the parties are bound by the policy's plain and unambiguous terms. *SawHorse, Inc. v. S. Guar. Ins. Co. of Georgia*, 269 Ga. App. 493, 494 (2004). Although a court must construe any ambiguities strictly against the insurer, "if the language is unambiguous and but one reasonable construction is possible, the court will enforce the contract as written." *Id.* at 494-95 (internal citations and quotations omitted). Further, when construing an insurance policy, the court "must consider it as a whole, give effect to each provision,

10

and interpret each provision to harmonize with each other." *Auto-Owners Ins. Co. v. State Farm Fire & Cas. Co.*, 297 Ga. App. 751, 754 (2009).

Finally, "an insured claiming an insurance benefit 'has the burden of proving that a claim falls within the coverage of the policy.'" *Forster v. State Farm Fire & Cas. Co.*, 307 Ga. App. 89, 91 (2010).

## II. **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Liberty argues that the only evidence before the Court indicates that the water intruded, not because the rain came through a storm-created opening (there was no opening), but because the property had been inadequately maintained. (DMSJ [78] at 10.) In support of its position, defendant points to the findings made by three different adjusters who evaluated Mr. Dashtpeyma's claim. (*See id.* at 13-15.) In response, plaintiff presented no evidence or expert opinions refuting the expert opinions of the three insurance adjusters, each of whom were properly and timely disclosed pursuant to FED. R. CIV. P. 26. (*See* Rule 26 Disclosures [58], [59] & [60].) Instead, the plaintiff argues that defendant admitted to "fabricating documents" and "manipulating data," (Pl.'s Resp. [86] at 1, 6, 8, 10, 16, 18 & 20), and thus, summary judgment should be denied. Plaintiff also claims that the word "opening," as used in the policy, is ambiguous. (*Id.* at 18 & 27.)

11

As to plaintiff's argument that defendant supposedly admitted to manipulating data and fabricating documents, many of the plaintiff's statements as to this argument contain no citations.  When plaintiff does cite the record in support, he cites to the deposition of Ralph Gill, the senior loss specialist for Liberty who reevaluated plaintiff's insurance claim.  (*Id.* at 6, 8 & 10.)  The Court reviewed the *entire* deposition of Ralph Gill and finds plaintiff's argument to be unsupported by that testimony.  For example, plaintiff cites to page 77, line 9 of the Gill deposition to support an allegation that defendant fabricated documents. (*Id.* at 10.)  That portion of the deposition concerned a letter sent by Mr. Gill to Mr. Dashtpeyma on August 31.  (*See* Gill Dep. [57] at 75.)  The letter, however, was mistakenly dated in the top left corner as "August 1, 2011." (*Id.* at 75.)  Seizing on this typographical error, the plaintiff questioned the authenticity of the document since the dates in the body of the letter, August 16 and 17, are after the date in the top left corner of the letter, August 1.  Even after Gill admitted that he typed the letter and simply made a typographical error in the heading (*id.*), plaintiff continued questioning that suggested some sinister purpose by Gill, eventually leading to the following exchange, which plaintiff cites as support of his claim that the defendant "fabricated documents":

12

> **Q (Mr. Dashtpeyma, as *pro se* counsel):** Can you state whether or not this letter is nothing but a fabrication?
>
> **A (Mr. Gill):** I typed the letter.
>
> **Q:** So it's not a fabrication, is it?
>
> **A:** Well, it depends on what you mean by fabrication. <u>I fabricated --</u>
>
> **Q:** It means you made up some date which you can not elaborate or you can not support the date that's there in your own letter, can you?
>
> **A:** I didn't change the dates.  I mistakenly dated this letter and --
>
> **Q:** And you --
>
> **A:** -- but I typed this letter.

(*Id.* at 77)(emphasis added).

It is clear that Gill was not admitting to fabricating any documents.  Gill was attempting to answer plaintiff's question when he was cut off.  Further, there were several instances where the plaintiff and deponent could not understand each other clearly.  Moreover, there was nothing amiss about Mr. Gill asking for clarification of the definition of "fabrication."  Adding to the confusion was the fact that plaintiff continued to question Gill as if Gill had not already admitted to making a typographical error.  For these reasons, the Court finds the plaintiff's claim that defendant admitted to fabricating documents to be misleading and entirely unsupported by the record.

13

### A.   Damage to Plaintiff's Home

Plaintiff's claim for damages under the insurance contract are two-fold. First, plaintiff claims that the policy covers damage to his home resulting from the storm. Second, plaintiff argues that the damage to his personal property, such as his stereo and some Persian rugs, is also covered by the policy.

It is not disputed that rain water leaked into plaintiff's home and caused damage. Defendant argues, however, that the damage is excluded by the unambiguous terms of the insurance contract. The Court agrees with the defendant that the terms of the policy are unambiguous and therefore, the Court must enforce the contract as written. *SawHorse,* 269 Ga. App. at 494-95.

Under the section covering plaintiff's dwelling, the policy explicitly provides that "we [the insurer] do <u>not</u> insure, however, for loss...caused by...wear and tear, marring [or] deterioration" or any loss "excluded under Section I - Exclusions" (the "Exclusions section"). (Policy [5] at 17 (section numbering excluded).) The Exclusions section excludes coverage, regardless of the terms of any other provision, for any loss to property caused by "faulty, inadequate or defective . . . maintenance" of the property. (*Id.* at 18-19 (section numbering excluded).) All three of the adjusters found that the water-based intrusion was the result of an ongoing lack of maintenance, wear-and-tear, and deterioration. (Monaghan Aff. [78]

14

at ¶ 6; Gill Dep. [57] at 36; Aucoin Dep. [73] at 20.)

Plaintiff provides no evidence to rebut these findings by properly-disclosed experts. Instead, plaintiff clings to his unsupported claim that defendant admitted to fabricating documents. As this Court previously found, that argument is without merit. Thus, the evidence indicates that the rainwater damage to plaintiff's home was caused not by the severity of the storm itself, but by "inadequate or defective maintenance, as well as wear and tear, neglect and deterioration of [the] siding and window sills." (Monaghan Aff. [78-1] at ¶ 6.) Therefore, coverage is excluded under either the wear-and-tear or deterioration clauses of the Exclusions section. For these reasons, the Court agrees with the defendant that plaintiff failed to meet his "burden of proving that [his] claim falls within the coverage of the policy," *Forster*, 307 Ga. App. at 91.

**B.   Damage to Plaintiff's Personal Property**

The policy provides that Liberty will insure for damage to personal property if caused by one of the specifically-enumerated perils. (Policy [5] at 17.) One of the perils listed is "windstorm or hail," but the policy provides that "[t]his peril does <u>not</u> include loss to property contained in a building caused by rain, snow, sleet, sand or dust *unless the direct force of wind or hail damages the building causing an opening in a roof or wall* and the rain, snow, sleet, sand or dust enters through this opening." (*Id*. at 18)

15

(emphases added).  Georgia law treats insurance policies no differently than other contracts and the parties are bound by their plain and unambiguous terms.  *Park 'N Go of Georgia, Inc. v. U.S. Fid. and Guar. Co.*, 266 Ga. 787, 791 (1996).  The above clause makes clear that any damage caused to plaintiff's personal property caused by rain is not covered unless there has also been windstorm or hail that created an "opening" in the house into which the rain entered.

Plaintiff argues, however, that this clause should not be enforced because the word "opening" is ambiguous.  (Pl.'s Resp. [86] at 18-19, 27-28.)  "A word or phrase is ambiguous when it is of uncertain meaning and may be fairly understood in more ways than one." *Akron Pest Control v. Radar Exterminating Co., Inc.*, 216 Ga. App. 495, 497 (1995).  However, "if the terms used are clear and unambiguous[,] they are to be taken and understood in their plain, ordinary, and popular sense.  Dictionaries supply the plain, ordinary and popular sense."  *Id.*  In the present case, the Court finds that the term "opening" is clear.  An "opening" is defined as "an open space affording passage or view" or "a gap or breach."  Webster's II New Riverside University Dictionary 823 (1986).  For these reasons, the Court concludes that the windstorm/hail peril clause excludes any damage caused by rain unless an opening has been created by the direct force of wind or hail, and the rain subsequently has entered the house through this "open space" or "gap" created in the roof or wall.

16

Here, there is no evidence that an "opening" was created by the wind or hail that struck the plaintiff's house during the April 2011 storm. James Monaghan visited the house two weeks after the storm hit and took extensive pictures detailing the damage to the house. (*See* Monaghan Dep. [74] at 28.) He found no evidence of storm damage that created an opening (*id.* at 59), and none of the pictures of the home show any opening where rainwater came into the house, let alone an opening caused by wind or hail. (*See id.* at Ex. 11.) Further, plaintiff does not argue that an opening was created, just that the term is ambiguous since it can have several definitions. (Pl.'s Resp. [86] at 27.) However, the inquiry is not whether a term may have several definitions, but whether the term, as used in the contract, is plain and unambiguous. *See Akron Pest Control*, 216 Ga. App. at 497. Therefore, even though the term "opening" has several definitions, the meaning of the term opening *as used in the policy* is not uncertain or "fairly understood in more ways than one." *Id*. For example, no reasonable person would believe that the word "opening," when used in the present context means "an opportunity to achieve something," which is the definition that plaintiff advances. (Pl.'s Resp. [86] at 27.)

Accordingly, as the policy is unambiguous and no "opening" was created by the direct force of wind or hail, the damages to the plaintiff's personal property are also excluded. For the above

17

reasons, the plaintiff has failed to meet his burden and thus, the defendant's motion for summary judgment [78] should be **GRANTED.** *See Forster*, 307 Ga. App. at 91.

### C. Plaintiff's Bad-Faith Claims

Defendant also moves for summary judgment on plaintiff's bad faith claims. (DMSJ [78] at 16.) Plaintiff claims he is owed damages pursuant to O.C.G.A. §§ 33-4-6, 13-6-11 and 13-11-8.

#### 1. O.C.G.A. § 33-4-6

In order to recover penalties and attorney's fees for a refusal to pay an insurance claim, it must be shown that the refusal was in 'bad faith.' O.C.G.A. § 33-4-6. 'Bad faith' means "any frivolous and unfounded refusal in law or in fact to comply with demand of the policyholder to pay according to the terms of the policy." *Interstate Life & Accident Ins. Co. v. Williamson*, 220 Ga. 323, 324-25 (1964)(internal quotations and citations omitted). As the provision for damages and attorney fees constitute a penalty, it must be strictly construed and "[t]he right to such recovery must be clearly shown." *Id.* at 325 (quoting *Love v. Nat'l Liberty Ins. Co.*, 157 Ga. 259, 271 (1924)). Further, the burden is on the insured to show that such a refusal was made in bad faith. *Id.*; *Moon v. Mercury Ins. Co. of Georgia*, 253 Ga. App. 506, 507 (2002).

As the Court has found that defendant Liberty properly denied plaintiff's claim, it obviously cannot be liable for acting in bad

18

faith in doing so. Further, even had the Court held that there were disputed issues of fact that precluded summary judgment on liability, plaintiff still could not prevail on a bad faith claim as defendant had reasonable grounds to deny the claim. *See United States Fid. & Guar. Co. v. Woodward*, 118 Ga. App. 591, 594 (1968)("If there is any reasonable ground for the insurer to contest the claim, there is no bad faith.") All three of the adjusters who reviewed plaintiff's claim found that the damage to his property was not covered by the policy because of the rotting siding and window sills. (Monaghan Aff. [78] at ¶ 6; Gill Dep. [57] at 36; Aucoin Dep. [73] at 20.) Defendant Liberty reasonably relied on the evaluations of their adjusters in denying the claim.

2. <u>O.C.G.A. §§ 13-6-11 and 13-11-8</u>

Plaintiff's claim for damages pursuant to O.C.G.A. §§ 13-6-11 and 13-11-8 are barred by Georgia law because O.C.G.A. § 33-4-6 provides the exclusive remedy for an insurer's bad faith refusal to pay a claim. *Howell v. S. Heritage Ins. Co.*, 214 Ga. App. 536, 536 (1994)(holding that the "[insured's] claim for attorney fees and expenses of litigation under O.C.G.A. § 13-6-11 [was] not authorized [because] the penalties contained in O.C.G.A. § 33-4-6 are the exclusive remedies for an insurer's bad faith refusal to pay insurance proceeds"). Therefore, plaintiff may not properly bring a claim for damages pursuant to these other statutory sections based on Liberty's

19

decision to deny his insurance claim.

For these reasons, the defendant's motion for summary judgment with respect to plaintiff's claim for bad-faith damages under the above Georgia statutes is also **GRANTED.**

## CONCLUSION

For the above reasons, the defendant's Motion for Summary Judgment [78] is **GRANTED.**

SO ORDERED, this 27th day of September, 2013.


/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE